## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 28 2016, 9:08 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Megan Shipley
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of:

V.G. *(Minor Child)*,
*Child in Need of Services*

and

R.G. *(Mother)*

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

December 28, 2016

Court of Appeals Case No.
49A02-1605-JC-1071

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge

The Honorable Rosanne Ang, Magistrate

Trial Court Cause No.
49D09-1511-JC-3428

**Robb, Judge.**

# Case Summary and Issues

[1] R.G. ("Mother"), a minor, is the mother of two-year-old V.G. A few weeks after V.G was born, he began living with his father, L.C. ("Father"), and his paternal grandmother ("Paternal Grandmother"). Mother asked Father to care for V.G. because the electricity was shut off at her residence, where she lived with her mother ("Maternal Grandmother"). In October 2015, Maternal Grandmother kicked Mother out of the house, leaving her with no choice but to spend a night outside before ultimately ending up in a shelter. The Indiana Department of Child Services ("DCS") filed a verified petition alleging Mother to be a child in need of services ("CHINS"), and Mother was subsequently adjudicated a CHINS. DCS also filed a verified petition alleging V.G. to be a CHINS due to Mother's inconsistent housing and inability to provide for V.G.'s basic needs. Following a fact-finding hearing, the juvenile court adjudicated V.G. a CHINS. Mother appeals the juvenile court's adjudication of V.G. as a CHINS, raising two issues for our review: (1) whether DCS presented sufficient evidence to support the juvenile court's determination V.G. is a CHINS; and (2) whether the juvenile court's dispositional order complied with Indiana Code section 31-34-19-6. Concluding there is sufficient evidence and the juvenile court's dispositional order complied with the statute, we affirm.

# Facts and Procedural History

[2] V.G. is the child of Mother and Father.[1] For the first few weeks following V.G.'s birth, he lived with Mother and Maternal Grandmother at a relative's home. However, when the relative failed to pay the electric bill, the electricity was shut off and Mother asked Father to care for V.G. V.G. has lived with Father and Paternal Grandmother ever since.

[3] Following V.G.'s birth, Mother had an inconsistent and unstable housing situation. From April 2014 to June 2014, Mother lived in her aunt's home with Maternal Grandmother and Mother's siblings. In June 2014, Mother, Maternal Grandmother, and Mother's siblings moved into a different relative's house and lived there until August 2014. From August 2014 to September 2014, Mother's family lived in a shelter. In September 2014, Mother and her family lived with a different aunt, and lived there until Maternal Grandmother found an apartment in October 2015.

[4] In October 2015, Mother wanted to see V.G. and repeatedly asked Maternal Grandmother to take her to pick him up. However, Maternal Grandmother refused and told Mother she had given Paternal Grandmother guardianship of V.G. without Mother's knowledge or consent. On Halloween, Mother wanted to take V.G. trick-or-treating with their family and asked Maternal Grandmother to pick V.G. up from Father's house. Maternal Grandmother initially agreed, but later refused. Mother and Maternal Grandmother then

---

[1] V.G.'s date of birth is April 6, 2014.

began to argue and Maternal Grandmother "hit [Mother] in [the] head with a pan." *Id.* at 68. Mother called the police, and she and her siblings went to stay with their father ("Maternal Grandfather") for the weekend.

[5] The following week, Maternal Grandfather attempted to drop Mother off at Maternal Grandmother's house, but Maternal Grandmother refused to let her come inside. Maternal Grandfather told her to "tell [Maternal Grandmother] that she needs to let you in . . . she is your mother and she need[s] to let you in. . . . If not, call my grandma." *Id.* at 69. Maternal Grandfather left and Maternal Grandmother did not let Mother inside the home, so Mother spent the night outside. Mother went to school the next day and reported the incident to her high school's social worker who called DCS. Mother was placed at Stopover, Inc., a local Indianapolis youth shelter, for "about a week" before Maternal Grandfather picked her up. *Id.* at 70. During Mother's stay at Stopover, DCS opened a case and began investigating whether she was a CHINS. Ultimately, Mother was adjudicated a CHINS and custody was awarded to Maternal Grandfather. Mother began living with Maternal Grandfather at a relative's home, and DCS deemed that home "appropriate" for Mother and approved her living there. *Id.* at 154.

[6] On November 24, 2015, DCS filed a verified petition alleging V.G. to be a CHINS. The petition alleged:

1. [Mother], mother of [V.G.], has failed to provide the child with a safe, stable, and appropriate living environment.

2. [Mother] has not been providing the child with basic care and necessities.
3. [V.G.] has been residing with [Paternal Grandmother] . . . but [Paternal Grandmother] lacks guardianship for the child and is unable to meet his medical needs.
4. [Mother] lacks stable housing, and she has not taken necessary action to adequately address the above-mentioned issues.
5. [Father], alleged father of [V.G.], is unable to ensure the child's safety and well being while in the care and custody of [Mother].
6. Due to the foregoing reasons, the coercive intervention of the Court is necessary to ensure the child's safety and well being.

Appellant's Appendix at 24.

[7]    The juvenile court held a fact-finding hearing on March 28, 2016. At the hearing, Mother testified that instead of staying with Maternal Grandfather, she had been staying at her half-sister's house with several other relatives. This house had not yet been approved by DCS for Mother to reside there. Mother also testified she did not have a job, although she was currently looking for one. As to who would provide monetary support for V.G., Mother testified Maternal Grandfather and her half-sister's mother would help provide for V.G.'s basic needs such as diapers, food, and clothing.

[8]    DCS family case manager Shavon Flemmons testified her original concern for V.G. was that "we had a minor mom and we had a minor child. . . . [M]om had no place to go. [V.G.] was placed with [Paternal Grandmother] and [F]ather, but they didn't have any type of guardianship or custody of him." Tr.

at 136. She further testified of her concerns with Mother's new housing situation, stating,

> I haven't been able to be in her home and I haven't been able to verify actually where they are staying and when we came to our last hearing, that was when . . . it was just brought to my attention that she was staying [at her half-sister's house]. So, she told me . . . [Maternal Grandfather] and her sister's mother had spoken and, I guess, they had said that . . . she could stay there. I told her that was not an issue, however, I need to know that because if that's where you're living, we have to do the proper background checks and fingerprints and things for you to be living there. And . . . that has—has been the only issue that we've had, which is just the continued [sic] of not knowing, being able to verify, actually. They say that [Maternal Grandfather's house] is the address, but I've never seen them in that address.

*Id.* at 143-44.

[9] At the conclusion of the hearing, the juvenile court found the allegations in the petition to be true and adjudicated V.G. as a CHINS. On April 28, 2016, the juvenile court issued a dispositional order leaving V.G. in relative care. The juvenile court further ordered Mother to participate in home-based case management, parent education, and to follow DCS' recommendations. As to Father, the juvenile court ordered him to participate in the Father Engagement program and to follow DCS' recommendations. Mother now appeals.

# Discussion and Decision

# I. CHINS Adjudication

[10] Mother argues DCS did not present sufficient evidence to support the juvenile court's determination V.G. is a CHINS. Indiana Code section 31-34-1-1 provides circumstances under which a child may be deemed a CHINS. It states,

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
>> (A) the child is not receiving; and
>>
>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

Ind. Code § 31-34-1-1. DCS must prove by a preponderance of the evidence a child is a CHINS. Ind. Code § 31-34-12-3. Further, the CHINS statutes do not require that a court wait until a tragedy occurs to intervene. *Roark v. Roark*, 551 N.E.2d 865, 872 (Ind. Ct. App. 1990). Rather, a child is a CHINS when he or she is endangered by parental action or inaction. *Id.* The purpose of a CHINS adjudication is not to punish the parents, but to protect the children. *In re L.C.*, 23 N.E.3d 37, 39 (Ind. Ct. App. 2015), *trans. denied*.

When we review the sufficiency of the evidence in a CHINS determination, "[w]e neither reweigh the evidence nor judge the credibility of the witnesses." *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). Instead, "[w]e consider only the evidence that supports the [juvenile] court's decision and reasonable inferences drawn therefrom." *Id.* We reverse only upon a showing that the decision of the juvenile court was clearly erroneous. *Id.*

## A. Mother's Ability to Care for V.G.

Mother first argues there is insufficient evidence to establish V.G. "was deprived of necessary food, clothing, shelter, supervision, medical care, [or] education[.]" Brief of Appellant at 15. Specifically, she argues because she placed V.G. with Father and Paternal Grandmother, she did not fail to provide a safe and stable home for V.G. Initially, we note Father and Paternal Grandmother both lack a guardianship for V.G., and as of the date of the fact-finding hearing, Father had not established paternity. Further, the evidence presented at the fact-finding hearing indicates Mother lived in a shelter on two separate occasions and spent the night outside alone once—albeit not while V.G. was in her care—as a result of her parents' refusal to support her. From April 2014 until the fact-finding hearing in March of 2016, Mother has lived in at least six different places and often with different members of her extended family. Even after her own CHINS proceeding in which DCS determined Maternal Grandfather's residence was appropriate for her, Mother decided she would rather live at her half-sister's home, which, at the time of the fact-finding

hearing, DCS had not yet inspected, approved, or determined was suitable for Mother.

[13]     The evidence further establishes Mother has no ability to provide for V.G.'s basic needs such as food and clothing. Mother testified she is still a junior in high school and currently does not have a job or income. As for who would provide for V.G.'s basic needs, Mother testified Maternal Grandfather and her half-sister's mother have offered to help with expenses. Maternal Grandfather testified, "I could give him all the support that any grandparent would give . . . their grandchild." Tr. at 163. However, given the fact Mother has decided to move out of Maternal Grandfather's home and his past reluctance to assist Mother when she needed a place to stay, the juvenile court did not find his offer to help to be credible. The juvenile court stated,

> And, realistically, I do have to wonder, if [Maternal Grandfather] is now saying that he is a positive support, I would have to wonder where that support was when [Mother] had to sleep somewhere—I still don't know—when he dropped [Mother] off at [her] mom's. And so I definitely doubt the veracity of that testimony.

Tr. at 196; *see also In re K.D.*, 962 N.E.2d at 1253 (appellate courts will not reweigh evidence or judge the credibility of witnesses).

[14]     Based upon our review of the record, we conclude there is sufficient evidence to support the juvenile court's determination V.G. is a CHINS. For most of his young life, V.G. has been left in the care of Father and Paternal Grandmother, neither of whom have established a guardianship, nor has Father established

paternity. Further, Mother is unable to provide V.G. with basic care that he needs such as shelter, food, and clothing. Mother has lived in multiple residences in the last two years, including two stints in local shelters because she had nowhere to live. She has no income to provide V.G. with his basic needs, and the juvenile court simply did not find Maternal Grandfather's testimony that he would provide for V.G. to be credible. The juvenile court's determination V.G. is a CHINS is not clearly erroneous.

## B. Coercive Authority of the Court

[15] Mother also argues there is insufficient evidence to support the finding that coercive intervention of the court is necessary to ensure V.G.'s safety. DCS must prove "the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *In re S.D.*, 2 N.E.3d 1283, 1287 (Ind. 2014). The requirement that the child's needs are unlikely to be met without the intervention of the court guards against unwarranted State interference with family life, reserving interference for families "where parents lack the *ability* to provide for their children," not merely where they "encounter *difficulty* in meeting a child's needs." *Lake Cnty. Div. of Family & Children Servs. v. Charlton*, 631 N.E.2d 526, 528 (Ind. Ct. App. 1994) (emphasis in original).

[16] Here, DCS has demonstrated Mother has more than mere difficulty in providing for V.G.'s needs. Mother has provided little to no care for V.G. since he was born, nor did she have the ability to, despite the fact she has sole legal

custody of V.G. *See* Ind. Code § 31-14-13-1 (stating a biological mother of a child born out of wedlock has sole legal custody of the child). As noted above, Mother has no income and, until recently, has not had a stable living situation since V.G. was born. Since DCS became involved in Mother's life, Mother has found suitable housing which has been approved for her to have unsupervised parenting time with V.G, and we commend Mother for her recent improvements and for complying with DCS. However, in light of the fact Mother is a minor, has no job or source of income, has never consistently taken care of V.G., and has struggled in the past to find or maintain suitable housing, the juvenile court's conclusion that coercive intervention is necessary is not clearly erroneous.

## II.  Dispositional Order

[17]    Finally, Mother argues the juvenile court erred in finding continued supervision was necessary to protect V.G., and asserts the dispositional order does not comply with Indiana Code section 31-34-19-6, which states,

> If consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that:
>
> (1) is:
>
> > (A) in the least restrictive (most family like) and most appropriate setting available; and
> >
> > (B) close to the parents' home, consistent with the best interest and special needs of the child;

(2) least interferes with family autonomy;

(3) is least disruptive of family life;

(4) imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; and

(5) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.

[18] We disagree with Mother that the juvenile court's dispositional order does not comply with Indiana Code section 31-34-19-6 or that it erred in ordering continued supervision. The dispositional order granted wardship of V.G. to DCS and maintained V.G.'s placement in relative care. The juvenile court ordered Mother to participate in home-based case management, parent education, and to follow DCS' other recommendations. The dispositional order also recognizes it is in V.G.'s best interest to remain outside of Mother's care; however, the juvenile court authorized Mother to have unsupervised parenting time with V.G.

[19] As to Mother's argument the order was not the least disruptive of family life or the least restrictive of family autonomy, we note that V.G.—aside from a few weeks following his birth—has not lived with Mother and the juvenile court maintained V.G.'s placement in relative care where he has been for almost two years. Aside from Mother's ordered participation in parental education and home-based case management, minimal change occurred in Mother's or V.G.'s family life. Further, the juvenile court permitted Mother to exercise unsupervised parenting time with the ultimate goal of reunification with V.G.

In sum, Mother has failed to demonstrate the dispositional order did not comply with the statute or that continued supervision was unnecessary.

# Conclusion

[20] DCS presented sufficient evidence to prove V.G. is a CHINS and the juvenile court's order complied with Indiana Code section 31-34-19-6. Accordingly, we affirm the juvenile court's judgment and order.

[21] Affirmed.

Kirsch, J., and Barnes, J., concur.